8444

FERGUSON v. SOUTHERN RY.

1. CARRIER—FREIGHT—NEGLIGENCE.—Whether freight may have been at the place it was damaged by a flood by reason of negligent delay of transportation and whether such delay was only a remote cause of the damage, is an open question in this State.

2. IBID.—IBID.—ACT OF GOD—ISSUES.—Under the evidence in this case it was properly held that the flood which damaged the freight in question was the act of God, but in view of the information the carrier had as to the flood and the opportunity to remove the goods to a safe place, whether it was negligent in not so doing was properly sent to the jury.

Before ERNEST MOORE, special Judge, York, November term, 1910. Affirmed.

Action by W. E. Ferguson against Southern Railway Company. Defendant appeals.

*Messrs. B. L. Abney* and *McDonald & McDonald,* for appellant. *Messrs. McDonald & McDonald* cite: *There is*

*no liability for a loss which could not reasonably have been foreseen or anticipated:* 13 Ency. 921; 21 Ency. 486, 489; 98 S. W. 939; 24 Am. St. R. 929; 15 Col. 333.   *The negligence intermingling with the act of God must be the co-operating or proximate cause:* 29 S. C. 101; 65 S. C. 502; 110 Am. St. R. 361; 117 Mo. App. 288; 113 Mo. App. 544; 126 Mo. App. 532; 41 Am. R. 696; 59 S. E. 949; 1 Thomp. on Neg., secs. 70-75.   *Degree of care required:* 19 Am. R. 594; 24 Am. St. R. 929; 11 Am. St. R. 60, 359; 20 L. R. A. 812.   *Negligent delay in carriage will not make the carrier liable for loss by unprecedented flood:* 7 Rich. L. 409; 29 S. C. 96; 75 Kan. 222; 10 L. R. A. (N. S.) 658; 18 *Id.* 177; 77 U. S. 176; 57 Am. Dec. 695; 135 Fed. 135; 49 S. E. R. 208; 45 S. E. R. 522; 64 S. W. 999; 71 Am. St. R. 543; 36 Am. St. R. 839.

*Mr. Geo. W. S. Hart,* contra: *What was the measure of carrier's duty to plaintiff:* 10 Wall. 258; 17 Wall. 661; 10 Wall. 90; 87 S. C. 243; 65 S. C. 543; 65 S. C. 509; 29 S. C. 101; 124 Ga. 322; 18 Am. R. 618; 2 Speer. 206; 111 U. S. 241; 84 S. C. 299; 77 S. C. 243; 1 Hill 222; 2 Bail. 161; Barrows on Neg. 228; 39 S. C. 59; 26 S. C. 264.

March 23, 1912. The opinion of the Court was delivered by

MR. JUSTICE HYDRICK. Plaintiff recovered judgment against defendant for $34, the value of a lost shipment of sugar and rice, consigned to him, at Yorkville, S. C., by the Tiedeman Company, of Charleston, S. C., on August 24, 1908, and also the penalty of $50, provided by statute, for the failure of defendant to pay the claim therefor within the time fixed by the statute, after the filing thereof. Defendant admitted the loss of the goods while in its possession, at Kingville, S. C., on August 28, 1908, and undertook to excuse itself from liability by showing that they were destroyed by the act of God, without any fault on its part.

At the close of all the testimony, defendant moved the Court to direct the verdict in its favor, on the ground that no reasonable inference could be drawn from the testimony other than that the plaintiff's goods had been destroyed by an unprecedented flood, without any negligence on its part. The Court ruled that the flood which destroyed the goods was, indeed, unprecedented, and was, therefore, the act of God, but refused the motion, holding that the testimony was susceptible of more than one inference upon the question whether defendant's negligence contributed to the loss. Counsel on both sides agree that the sole question for the consideration of this Court is whether there was error in this ruling.

Before considering this question, we desire to notice a proposition announced in the charge which excluded from the consideration of the jury, as an element of negligence of the defendant, the fact that the goods may have been at the place where they were destroyed by reason of negligent delay in their transportation,—the Court holding that such delay, if proved, was only a remote and not a proximate cause of the loss. Appellant's attorneys cite numerous authorities to sustain this proposition,— among others,—*Slater* v. *Ry.*, 29 S. C. 96, 6 S. E. 936; *Sonneborn* v. *Ry.*, 65 S. C. 502, 44 S. E. 77; *Lipford* v. *R. Co.*, 7 Rich. 409. Neither of these cases sustains the proposition. If anything, the language used in the opinion in the *Slater case*, quoted below, makes more strongly against it than for it. See, also, *Campbell* v. *Morse*, Harp. 468. The question is one upon which the authorities elsewhere are divided, and we have found no case in which it has ever been decided by this Court, and, as it is not necessary to the decision of this case, we pass it without further comment, except that we must not be understood as approving or disapproving the statement of the law on this subject as made by the Court below. We regard the question as still an open one in this State.

The rule upon which this case must be decided was stated thus in *Slater* v. *Ry.*: "Where an act of God causes injury to property in the hands of a common carrier, and such act is the sole cause of such injury, then the proof of this fact is a perfect shield. But if there be any negligence on the part of the carrier, which, if it had not been present, the injury would not have happened, notwithstanding the act of God, the carrier cannot escape responsibility. And the *onus* is upon the carrier to show not only that the act of God was the cause, but that it was the entire cause; because it is only when the act of God is the *entire* cause that the carrier can be shielded."

Before proceeding to a consideration of the testimony, we state some of the principles which should guide the Court in deciding whether there is any evidence of negligence on the part of a defendant in a case like this, and which should likewise guide the jury in passing upon its sufficiency, and in determining whether it preponderates.

In 1 Thomp. on Neg., sec. 28, the author says: "In determining whether the due degree of care has been exercised in any situation, reference must be made to the facts and surroundings of that situation, and the question cannot be determined by abstract theorizing or idealizing. The question must be looked at as the defendant might have looked at it, situated as he was, and surrounded as he was. The jury ought to determine it by their foresight, and not by their hindsight. Speaking with reference to this question, it has been quaintly reasoned that the fact that, after an injury occurs by accident, some man of genius discovers a superior method of preventing such accidents, does not show negligence in failing to use such method of prevention. Accordingly, that which never happened before, and which in its character is such that it would not naturally occur to prudent men to guard against its happening, cannot, when, in the course of years, it does happen, furnish good grounds for a charge of negligence in not foreseeing its possible happen-

ing, and guarding against that remote contingency." In *Cornman* v. *Eastern Counties R. Co.,* 4 H. & N. 786, Bramwell, B., said: "In such a case, it is always a question whether the mischief could have been reasonably foreseen. Nothing is so easy as to be wise after the event." In 21 A. & E. Enc. L. (2 ed.), it is said: "The mere fact that an injury might have been avoided by the adoption of certain precautions does not prove that there was fault in failing to anticipate and provide against it. Nor is the fact that after the occurrence of an accident it is seen that such accident might have been easily guarded against conclusive of negligence. Thus, where the possibility of a particular occurrence is demonstrated only by its happening, there is no liability in negligence. But the fact that no such accident as the one complained of had ever happened before is not, of course, conclusive of the fact that there was no negligence." In volume 13 of the same work, page 721, it is said: "An extraordinary flood is to be classed among the acts of God which no human power can prevent or avert. Whether it will relieve the carrier from liability, depends upon whether its results or natural consequences could, by the exercise of reasonable foresight and prudence, have been foreseen and guarded against. If the emergency was one that no human sagacity, guided by any of the known principles of human reasoning, could have anticipated, the carrier will be relieved. If, on the other hand, its effects might have been foreseen by the exercise of reasonable diligence and prudence, a failure to do so would be negligence and subject the carrier to damages, although the original cause was the act of God." And, on page 722 of the same volume, this rule is stated: "If a carrier discovers that goods intrusted to his care are in peril of injury or destruction by a flood, then it becomes his duty to use actively and energetically all the means at his command, or which it might be reasonably expected that one engaged in such business would possess, to meet the emergency, and save the property from injury, and any

neglect to use the means stated above, which prudent, skill-
ful men in that business might ordinarily be expected to use
in such an emergency, will subject the carrier to liability."

It requires no citation of authority to sustain the proposi-
tion that after a carrier has discovered, or, by the exercise
of reasonable prudence and diligence should have discovered,
that goods in his possession are subject to the perils of an
unprecedented flood, or other *vis major,* it is his duty to
exercise reasonable care and diligence to save them from
damage or loss.

The testimony covers some 240 pages of the "Case,"
and, while there are some differences between the witnesses
as to minor details, the material facts are practically undis-
puted; yet it would be difficult, if not impossible, to set
forth in a brief statement of the testimony,—and nothing
more can be attempted in this opinion—the settings and
colorings of the case, in the lights in which it appears from
a reading of all the testimony. Neither can the minor
details, which impress the mind, as the testimony is read, be
clearly brought out in such a synopsis.

Plaintiff's goods were destroyed at Kingville, which is a
station on defendant's road from Columbia to Charleston,
and is the point of junction of that road with another road
operated by defendant, running to Marion, N. C., via Cam-
den and Yorkville, the destination of plaintiff's goods.
Kingville is situated in the fork of the Congaree and Wateree
rivers, which unite about seven or eight miles below to form
the Santee. It is between three and four miles from the
Congaree, and from five to seven miles from the Wateree.
It is in the edge of the swamp of the Congaree, and the land
between it and each of the rivers is low, flat, swamp land,
subject to inundation by freshets. The station is built upon
made land, and the railroad tracks are raised several feet
above the adjacent swamps by embankments and trestles.
The rivers meet approximately at right angles. Just below
their confluence there is a high bluff on one side and the

highlands come down pretty close on the other, so that the swamp is narrow. Therefore in times of very high water in both rivers the passage is inadequate and the waters are dammed up and thrown back in the swamp above.

Besides the two lines mentioned, the defendant operates other roads in the State which pretty well cover the territory traversed by those rivers and their tributaries which form the Congaree and Wateree, and it has along its roads telegraph lines as a means of communicating intelligence as to conditions affecting the proper operation thereof. The United States government has a weather bureau at Columbia which co-operates with the railroads in obtaining and sending out information relative to the physical conditions which affect the operation of the roads. It maintains gauges at different places on the principle rivers from which reports are sent in and a record of them is kept. In times of high water in the rivers, flood warnings and bulletins giving information of the present and probable near future conditions are issued, and sent to those who are interested. Besides its own sources of information, the services of this bureau were at defendant's command. Ordinarily, therefore, the defendant would be expected to keep its agents advised of the approach of floods of such magnitude as to cause apprehension of danger. The testimony shows that, in this instance, the defendant was advised of the conditions existing throughout the State on the streams tributary to the Congaree and Wateree; and that it knew that, beginning about the 19th of August, rains had been continuously falling over the watersheds of these streams; and that, beginning about the 23d, they became unusual, both in quantity and in the extent of territory covered; so that, by the 24th, nearly all the streams in the upper part of the State began to rise, and on the 25th and 26th they had reached the flood stage. It was known that the floods in some of the larger of these streams were unprecedented in magnitude and destructive power. It was also known that they would

surely find their way into the Congaree and Wateree. Defendant also knew the records of previous floods in these rivers. The four greatest, of which there is any record, were those of 1852, 1865, 1888 and 1908. Those of 1852 and 1865 were about the same—about 34 feet in height at Columbia; that of 1888 33.3 feet, and that of 1908 35.8 feet. In 1888, the highest reading of the gauge at Camden, on the Wateree, was 33 feet; in 1908 it was 39.7 feet. Just here it should be noted that the channel to which the Congaree is confined at Columbia, even in times of flood, is much narrower than it is at Kingville. At Columbia, it is about 1,300 feet wide, while at Kingville it is between three and four miles wide. Hence, ordinarily, after the flood stage is reached, the river rises only about one-fourth as high at Kingville as it does at Columbia. In 1888, the water rose from 8 to 12 inches above the railroad tracks at Kingville. After that flood, the tracks were raised, according to the different witnesses, from 2 to 3 feet to put them safely above high water. In 1908, notwithstanding the river at Columbia was only about 2½ feet higher than in 1888, the water rose about six feet higher at Kingville than it did in 1888. The only reasonable explanation of this unusual phenomenon was attempted by Mr. J. W. Bauer, the section director of the weather bureau at Columbia, who thought it was caused by the fact that the crests of the floods in the Wateree and Congaree reached their confluence simultaneously, and the channel below, being too narrow to carry off the combined floods, the waters were thrown back into the swamps above, and upon Kingville. His theory was verified, at least to some extent, by the fact that the river gauge at Remini, on the Santee, showed only one flood crest, whereas, if the crests in the two rivers had not reached the Santee at the same time, it would have shown two flood crests, as it had theretofore always done, when there were floods in both rivers. He thought it a mere coincidence, which had

probably never happened before, and might never happen again.

Under the principles of law hereinbefore announced, it is clear that, if there was nothing more, defendant could not, in reason, have been expected to anticipate such an unprecedented occurrence, and provide against it.

It appears, however, that on Thursday morning, August 27th, the water began to rise in the swamp around Kingville, and about 7 o'clock that evening, it began to run over the railroad tracks, and was rising about 2½ inches an hour. This indicated that it had risen from 2 to 3 feet higher than the flood of 1888, and that all previous high water records had been broken. There were on the sidetracks in the yard from 15 to 17 cars of merchandise freight, including the plaintiff's goods. There were also some empty cars, and some loaded with dead freight, such as stone, coal, etc. Defendant had two engines on the ground, one attached to a construction train, and the other had just arrived, bringing the regular freight train from Columbia for Charleston. The freight train had to wait for the arrival of two passenger trains bound for Columbia, one a regular train on defendant's road, and the other a train of the Seaboard Air Line Railway which had been detoured over defendant's tracks on account of a washout on the Seaboard road. Those trains were not expected, and did not arrive, until eleven o'clock. So far as it appears from the testimony, both the engines at Kingville stood there idle from 7 until 11 o'clock. Either could have carried the cars containing merchandise to Gadsden, a station on defendant's road about four miles from Kingville, and put them in the sidetrack there. It is said, however, that the reason this was not done was because no one thought, or had any reason to think, that the water would rise as high as it did. Bearing in mind, however, that defendant knew of the extraordinary floods in nearly all the tributaries of the Congaree and Wateree; and, therefore, that it should have anticipated,

as it evidently did, an unprecedented rise of the water at Kingville; and that the water had already risen from 2 to 3 feet above all previous records, and was then rising at the rate of 2½ inches an hour, the question whether an ordinarily prudent and diligent person would then have thought that the time had come to take steps to save property which was exposed to the perils of such a flood is one about which reasonable men might differ. When the passenger trains passed, on their way to Columbia, the water had risen from 8 to 12 inches over the tracks. By order of the road master, who was on the ground, the freight train, after leaving about forty of its cars on the bridges and trestles through the swamp to weight them down and keep them from being washed away, was allowed to proceed on its way to Charleston. The other engine was kept busy cutting out and placing empty cars and cars containing dead freight on the other bridges and trestles in the swamp, until 1 o'clock a. m. on the 28th, when the water got so high that it put out the fire in the fire-box. When the freight cars were placed on the bridges and trestles on the main line, there could have been no other traffic over the road, and the cars containing merchandise freight could have been carried to safety by placing them on the main line a few hundred yards west of Kingville. Two of defendant's employees testified that they intended to do that, as soon as they got through placing the cars on the trestles, but that when they had finished that work, it was too late, because the water was then so high they could not run the engine.

Under the facts and circumstances stated, the question whether an ordinarily prudent and diligent carrier would have removed the goods to a place of safety was properly submitted to the jury.

Judgment affirmed.

*Only* MR. CHIEF JUSTICE GARY *and* MR. JUSTICE WOODS *participated in this opinion and they concur.*